**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

_____
                                                          )
**ALFA LAVAL, INCORPORATED,**                             )
                                                          )
    **Plaintiff,**                      )
                                                          )
    **v.**                             )    **CIVIL NO. 3:06CV306**
                                                          )
**DAVID NICHOLS et al.,[1]**                              )
                                                          )
    **Defendants.**                     )
_____)

**MEMORANDUM OPINION**

This matter is before the Court by consent of the parties on cross-motions for summary judgment.  28 U.S.C. § 636(c)(1).  For the reasons set forth herein, the Plaintiff's Motion for Summary Judgment (docket entry no. 36) is GRANTED and the Defendant's Motion for Summary Judgment (docket entry no. 38) is DENIED.

**I.  Undisputed Facts and Reasonable Inferences**

**A.**

Plaintiff Alfa Laval, Inc. ("Alfa Laval") is the United States subsidiary of the Alfa Laval Group, a Swedish company.  On March 3, 1987, Defendant David Nichols ("Nichols") executed an agreement with Alfa Laval that designated Nichols as the President and CEO of the company for a three-year term that was to end in February of 1990.  (Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem."), Ex. B.)  In 1988, however, the parties signed an additional agreement (the "1988 Employment Agreement") which extended Nichols' tenure for an additional three years to expire

_____

[1] David Nichols' former wife, Marilyn, was originally a named Defendant in the present case, but she was dismissed as a party for want of personal jurisdiction (docket entry no. 33).

on December 31, 1993.  (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem."), Ex. U, ¶ 2.)

Among other things, the1988 Employment Agreement established Nichols' annual salary,

vacation entitlement, and the use of an all-expenses paid company car.  (Id. ¶¶ 5, 7, 9.)

The 1988 Employment Agreement also provided that Nichols would be a member of Alfa

Laval's pension plan (Id. ¶ 10), with the terms of the pension benefits to be outlined in a separate

agreement (the "1988 Supplemental Pension Agreement" or "Supplemental Agreement").  The

Supplemental Agreement provided that Nichols would be eligible to retire with entitlement to a

"normal retirement pension at the beginning of the month during which [his] 60th birthday falls

(1st February, 2000)."  (Pl.'s Ex. D, subsection (a).)  Specifically, the Supplemental Agreement

provided in regard to Nichols' pension benefits that:

> Normal Retirement
>
> . . .
>
> This normal retirement pension will be paid to you, commencing on 1st February, 2000, payable monthly, of an annual amount equal to 2% of your Final Pensionable Salary[2] for each year of Group Service, subject to a maximum of 60% of Final Pensionable Salary, *less* the actuarial equivalent of any pension . . . which is attributable to any other pension scheme, plan or arrangement sponsored by the Alfa Laval Group, *but* disregarding any U.S. Social Security or Canadian statutory old age pension benefits, and this offset applies to all benefits described in this letter.

(Id.) (emphasis in original).  Thus, if Nichols retired at age sixty, he would be entitled to an

annual pension amount, paid on a monthly basis, equal to 2% of his final pensionable salary for

each year of service with any of the subsidiaries/affiliates of Alfa Laval, not to exceed 60% of

_____

[2] "Final Pensionable Salary" is defined in the 1988 Supplemental Pension Agreement as "the highest annual average amount of your annual base salary in any three consecutive years during the last ten years of your employment with [Alfa Laval]."  (Pl.'s Ex. D at 2.)

his final pensionable salary.

The 1988 Supplemental Pension Agreement also outlined Nichols' pension calculation if he chose to take early retirement.  As specified in the Supplemental Agreement, Nichols was eligible for early retirement after attaining age fifty-five (55) with his pension at that time being calculated in the same way as his Normal Retirement, *supra*, except that it would be "reduce[d] by 1/2% for each month that the pension commences prior to your Normal Retirement Date." (Pl.'s Ex. D, subsection (b).)  Regardless of when Nichols chose to retire, Nichols understood that the only funded plans of the Alfa Laval Group (the parent company of the Plaintiff) for which he knew he was eligible at the time he signed the 1988 Employment Agreement and the Supplemental Agreement were the Restated Retirement Pension Plan (the "Canadian Pension Plan") (Def.'s Ex. G) and the Retirement Income Plan (the "U.S. Pension Plan") (Def.'s Ex. H). (Pl.'s Ex. C ("Nichols Dep.") 64:7-12, Nov. 17, 2006.)

## B.

Nichols testified in deposition that in the Fall of 1991 he began to feel "burned out" from the pressure of his position as President and CEO of Alfa Laval, and that, as a result, the parties mutually agreed to terminate his employment effective at the end of that year, December 31, 1991.  (Nichols Dep. 68:7-70:10.)  The termination was confirmed by the parties' execution of an Employment and Termination Agreement (the "1991 Termination Agreement").  (Pl.'s Ex. E.)  Even though Nichols effectively resigned his dual positions as the President and CEO of Alfa Laval, the 1991 Termination Agreement provided for his continued employment with the company as a "Special Assistant" to the President, with that position to end two years later on December 31, 1993.  (Pl.'s Ex. E.)  The 1991 Termination Agreement also established February

1, 1995, as Nichols' retirement date, at which time he was to begin receiving the pension benefits as outlined in the Supplemental Agreement.  (Id. at 5.)  The calculation of pension benefits upon Nichols' retirement was to be as follows: "forty-two percent (42%) of USD 454,000 [Nichols' pensionable earnings] (USD 190,680) for the full calendar year 1995 paid in equal monthly installments (USD 15,890 per month)."  (Id.)  In other words, when Nichols retired in February of 1995, he would be entitled to a monthly pension payment of $15,890 per month.[3]

Notably, the 1991 Termination Agreement provided an offset provision:

> This pension benefit is *in lieu of and replaces all and any other pension benefits to which Mr. Nichols is or may be entitled under or pursuant to any other plan of [Alfa Laval]* and Mr. Nichols expressly waives all such rights on behalf of himself and all of his beneficiaries . . . .

(Id. at 6) (emphasis added).  Paragraph 15 of the 1991 Termination Agreement also specified that the 1988 Employment Agreement and the 1988 Supplemental Pension Agreement outlining the terms of Nichols' entitlement to pension benefits were "extinguished and superseded by" the provisions contained in the 1991 Termination Agreement.  (Id. at 7, ¶ 15.)  Indeed, Nichols conceded in deposition testimony that the benefits provided in the 1991 Termination Agreement replaced all other pension benefits to which he had been or otherwise would be entitled.  (Nichols Dep. 112:5-113:2.)

As part of the consideration for the 1991 Termination Agreement, Nichols signed two "Waiver of Pension Benefits" Agreements (the "Waiver Agreements") by which he released all of

---

[3]The Agreement also named Nichols' wife as the pension's "survival beneficiary" entitled to, in the event of Nichols predeceasing her, one-half of the stated pension benefits for the rest of her life, with the remaining half of the benefits going to Nichols' estate so long as Nichols' wife remained alive.  (Pl.'s Ex. E at 6.)

his entitlement to benefits derived from both the U.S. Pension Plan and the Canadian Pension

Plan.  (Pl.'s Exs. F, G.)  Each Waiver Agreement contained the following language in regard to

the particular Plan it referenced:

> David A. Nichols and [wife], being beneficiaries of a special pension benefit
> established by [the 1991 Termination Agreement] do hereby waive, release,
> forsake and forever give up on behalf of themselves, jointly and severally, . . .
> all rights and claims which they ever had, have or may have in any pension or
> retirement benefit in or as a result of a plan known as [the U.S. Pension Plan or
> the Canadian Pension Plan] and agree that neither they nor either one of them,
> directly or indirectly, will institute, make, support or stimulate any claim or
> claims for said benefits from the Plan[s].

(Id.)  Both Waiver Agreements further provided that:

> . . . in the event the Trustees of the Plan[s] or the Plan[s'] Administrator[s] *shall
> be compelled by operation of law* to distribute to David A. Nichols and/or [his
> wife], their estates or any entity or person with rights by or through them or
> either one, *the amount to be paid as a result of or by reason of the [1991
> Termination Agreement] shall be reduced, dollar for dollar, by the said
> distribution(s).*

(Id.) (emphasis added).

## C.

Nichols completed his role as the Special Assistant to the President, and his employment

with Alfa Laval ended on December 31, 1993, per the terms of the 1991 Termination Agreement.

However, at Nichols' request, Alfa Laval re-employed him from July 1, 1995, to December 31,

1995, so that he could be re-enrolled in the U.S. Pension Plan in order to qualify for retiree

medical benefits.  Nichols' re-employment with Alfa Laval resulted in yet another employment

agreement (the "1995 Termination Agreement") which became effective January 1, 1996.  (Def.'s

Ex. L.)  It was designed to supplant the prior 1991 Termination Agreement as to the term of

Nichols' employment.  (Id. at 1.)

The 1995 Termination Agreement re-set Nichols' retirement date for January 1, 1996, when he would be fifty-five years old.  Like the 1991 Termination Agreement, the 1995 Termination Agreement established that upon his retirement, Nichols would receive $15,890 per month in pension benefits with calculated adjustments made annually to account for inflation. (Def.'s Ex. L at 2.)  The Agreement specified that a portion of the pension benefit "may be payable through the [U.S. Pension Plan] but in no event will the aggregate benefit exceed the Initial Monthly Pension Benefit," *i.e.*, $15,890, "as adjusted."  (Id.)  Once again, Nichols' then-spouse was designated as his "survival beneficiary" who was entitled to one-half of Nichols' pension benefits upon Nichols' death.  More importantly, as was the case with prior agreements executed between Alfa Laval and Nichols, the 1995 Termination Agreement contained the following provision:

> This pension benefit is in lieu of and replaces all and any other pension benefits to which [Nichols] is or may be entitled to under or pursuant to any other plan of [Alfa Laval] and/or its affiliates, and [Nichols] expressly waives all such rights on behalf of himself and all of his beneficiaries . . . .

(Id.)  In addition to confirming Nichols' eligibility to participate in the Alfa Laval retiree medical plan, and having his U.S. Pension Plan reinstated, the 1995 Termination Agreement also explicitly noted that all other prior agreements between Nichols and Alfa Laval were "extinguished and superceded by this [1995 Termination] Agreement."  (Id. at 3, ¶ 3.)

In addition, paragraph 11 of the 1995 Termination Agreement specified that Alfa Laval's obligation to provide pension benefits to Nichols would be guaranteed by Tetra Laval U.S. Holdings, Inc. (the "Guarantor").  (Id. at 6, ¶ 11.)  The provision stipulated that if Alfa Laval were forced to replace the Guarantor, but was "unable or unwilling" to provide a suitable replacement, Alfa Laval would provide Nichols with a twelve month "Stand-by Letter of Credit from a major

-6-

U.S. financial institution in the sum of" $4 million, thereby "securing the guarantee obligations of" the 1995 Termination Agreement. (Def.'s Ex. L at 7, ¶ 11.) Additionally, the parties mutually agreed that if Alfa Laval could not provide a qualified guarantor, "the pension obligations of [the 1995 Termination Agreement] may be satisfied by means of a lump sum payment."[4] (Id.)

## D.

Nichols received his monthly pension benefits from Alfa Laval until 1999 at which time he requested a lump-sum buyout (the "1999 Lump-Sum Agreement") in lieu of all future pension obligations. (Nichols Dep. 138:21-143:15.) Alfa Laval acceded to Nichols' demand, agreeing to pay Nichols a total of $2,950,000 in full satisfaction of its pension obligations to him. After tax withholding, Nichols received $1,228,375.90, while his wife received $910,015.27. (Pl.'s Ex. J.) Nichols admitted in his deposition that the lump-sum buyout was intended to satisfy all of Alfa Laval's obligations to him under *all* pension plans administered by Alfa Laval, with the sole exception of any ERISA (Employee Retirement Income Security Act) – protected benefit. (Nichols Dep. 161:20-162:3; 192:10-21.)

## E.

In the Fall of 2005, Nichols discussed with associates whether he could seek benefits from the Canadian Pension Plan. (Nichols Dep. 196:20-205:7.) Pursuant to such discussions, he inquired of the Financial Services Commission of Ontario, Canada (the "Commission") whether he could make a valid claim for his Canadian Pension Plan benefits. (Id. 205:8-207:22; Pl.'s Exs.

---

[4]Paragraph 11 was amended in 1997 (the "1997 Amendment") to expand on the Letter of Credit provision, as well as to provide a scheme and calculation formula for a lump-sum buyout in the event the parties agreed on such a buyout. (Def.'s Ex. M.)

O, S.)  Citing the text of the Canadian Pension Plan (prohibiting the "assignment, alienation, surrender or commutation" of pension benefits), as well as Canadian law, the Commission concluded in a March 8, 2006, letter that Nichols could make such a claim, because "a member of a plan cannot waive their rights to their benefits, [and] it would appear that the waiver signed by [Nichols]" respecting the Canadian Pension Plan "is null and void."  (Def.'s Ex. B at 2.)  Even though the Commission noted that such a ruling represented a "double recovery on his pension entitlement," Alfa Laval was directed to take corrective action to remedy the situation so that Nichols could begin receiving payments under the Canadian Pension Plan.  (Id.)  Accordingly, Alfa Laval calculated the value of all payments due Nichols under the Canadian Pension Plan to be, as of January 1, 2006, $370,820.  (Pl.'s Ex. T ¶ 7.)

Alfa Laval contends that Nichols' claim for benefits (and subsequent award of benefits) constitutes a breach of contract in violation of the various agreements signed by Nichols that manifested his intention to waive any right to pension benefits previously due him, including the Canadian Pension, and it seeks to recoup the nearly $371,000 the Canadian government has compelled it to pay to Nichols.  Alternatively, Alfa Laval seeks relief under the equitable theories of unjust enrichment and restitution, arguing that Nichols' receipt of the Canadian Pension benefits amounts to "double dipping."  In opposition, Nichols contends that the waiver of entitlement to benefits due him under the Canadian Pension Plan was, as the Canadian government determined, *void ab initio*, and thus unenforceable.  He also asserts in his counterclaim (not resolved here) that even if the waiver was valid, the lump-sum buyout did not totally account for the full value of the Canadian Pension Plan.  Accordingly, pursuant to his argument, and only relevant in response to Alfa Laval's argument regarding "double dipping," he

argues that the Canadian government's order compelling Alfa Laval to provide benefits due him under the Canadian Pension Plan is not tantamount to an unenforceable double recovery of his pension benefits.

## II.  Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering whether to grant a motion for summary judgment, the court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Since this Court is faced with cross-motions for summary judgment, it must review each motion separately on its own merits.  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).  In considering each motion, the Court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion.  Id. (citation omitted).  Nonetheless, this Court is not to make credibility determinations, as that task is for the fact finder.  Anderson, 477 U.S. at 255.

To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Furthermore, a party may not avoid summary judgment by relying on affidavit evidence that seeks to contradict earlier deposition

testimony of the same party:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.   A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.

Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (internal citations omitted).  In essence, the Court must decide if the evidence when viewed in the light most favorable to the non-moving party "presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

### III.  Analysis

**A.  The 1999 Lump-Sum Agreement Accounted for Nichols' Canadian Pension Benefits**

The final agreement between the parties, the 1999 Lump-Sum Agreement, like all of the parties' previous agreements, contained a provision specifying that it was intended to "extinguish[] and supersede[]" all other prior agreements between Alfa Laval and Nichols, but it also provided that:  "*except* that provisions of the [1995 Termination Agreement and 1997 Amendment] which by their nature are intended to survive, shall survive and are not terminated hereby."  (Def.'s Ex. N at 2) (emphasis added).  While it is clear that the parties intended to have the 1999 Lump-Sum Agreement supersede "all other prior agreements" between them, it is also equally clear that the parties intended certain provisions in the 1995 Termination Agreement and the 1997 Amendment to survive and be binding.  The basic question before the Court, then, is which provisions of the 1995 Agreement and 1997 Amendment were intended "by their nature . . . to survive."

-10-

The parties agree that New Jersey law governs the resolution of Alfa Laval's breach of contract claim.  (Pl.'s Mem. at 9; Def.'s Mem. at 1.)  Indeed, both the 1991 Termination Agreement (Pl.'s Ex. K, ¶ 19) and the 1995 Termination Agreement (Def.'s Ex. L, ¶ 7) specifically provided that the parties' contracts would be governed by New Jersey law, and there is no indication that this choice-of-law provision changed at any point in the successive agreements.  Accordingly, and in light of the parties' stipulation to the same, it is reasonable to conclude that the choice-of-law provision "survived" as provided for in the 1999 Termination Agreement.

When reading a contract pursuant to New Jersey law, the court's ultimate goal is to discover the intention of the parties.  Highland Lakes Country Club & Cmty. Assoc. v. Franzino, 892 A.2d 646, 656 (N.J. 2006) ("When reading a contract, our goal is to discover the intention of the parties.") (citation omitted).  In attempting to discern this intent, the Court may "consider the contractual terms, the surrounding circumstances, and the purpose of the contract."  Id. Additionally, New Jersey law permits a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties.  Conway v. 287 Corp. Ctr. Assoc's, 901 A.2d 341, 347 (N.J. 2006).  Indeed, even when unambiguous, a court applying New Jersey law will:

> allow a thorough examination of extrinsic evidence in the interpretation of contracts.  Such evidence may include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties conduct.  Semantics cannot be allowed to twist and distort [the words'] obvious meaning in the minds of the parties. Consequently, the words of the contract alone will not always control.

> In sum, we permit a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties.  Extrinsic evidence may be used to uncover the true meaning of contractual terms.  It is only after the meaning of the contract is discerned that the parol evidence rule comes into

play to prohibit the introduction of extrinsic evidence to vary the terms of the contract.

Id. (internal citations and quotation marks omitted).

The purpose of the 1999 Lump-Sum Agreement was to "buy out" the monthly pension payments Nichols was receiving pursuant to the prior agreements with a one-time, lump-sum payment. Indeed, the 1999 Lump-Sum Agreement that Nichols executed specifically provided that "[n]o further non-qualified [supplemental] pension payments[5] will be made to me or to [my wife] thereafter, whether pursuant to the [1995 Termination Agreement or 1997 Amendment] or otherwise." (Def.'s Ex. N. at 2.) At the same time, the 1999 Lump-Sum Agreement gave Nichols the opportunity to pursue any claim he "may have under [ERISA] for vested benefits under an employee benefit plan, including but not limited to a monthly distribution to me from the [U.S. Pension Plan] . . . ." (Id.) Nichols asserts that the 1999 Lump-Sum Agreement provided for a one-time payout *only* for all pensions other than the Canadian Pension. (Def.'s Mem. at 12-13.) Stated another way, Nichols implies that the 1999 Lump-Sum Agreement's silence as to the Canadian Pension indicates that the it was not included in the calculation of the lump-sum amount. (Id.) However, Nichols had already waived any right to the Canadian Pension in the

_____

[5]A non-qualified pension plan has few restrictions placed upon it, and is unfunded in the sense that the sponsor does not have to set aside any assets or provide any guarantees beyond the initial contractual promise that its employees will receive the compensation. See Albertson's, Inc. v. Comm'r, 42 F.3d 537, 541 (9th Cir. 1994). Furthermore, a non-qualified plan may be limited to highly paid executives such as Nichols. Id. In contrast, a qualified pension plan is funded, generally through a trust, and there are a number of additional requirements that must be satisfied such as minimum participation, coverage, and vesting standards, and strict funding requirements. Id. at 542. However, with qualified plans, an employer may not discriminate in favor of highly compensated employees. Id. at 541 (citing I.R.C. § 401(a)(4) & (a)(5)). Although the Canadian Pension Plan was a qualified plan, it had already been waived by Nichols as of the time of the 1999 Lump-Sum Agreement *if* that provision of the Waiver Agreements was intended to "survive."

1991 Termination Agreement as confirmed by his deposition testimony. (Nichols Dep. 192:10-21.) The question is, therefore, whether his waiver was intended to "survive" as provided for in the 1999 Lump-Sum Agreement.

The provisions "intended to survive" from the 1995 Termination Agreement and the 1997 Amendment are not identified in the 1999 Lump-Sum Agreement. Thus, the Court may, pursuant to New Jersey law, consult the following evidence to ascertain the intent of the parties in crafting such open-ended language: "the particular contractual provision, an overview of all the terms, *the circumstances leading up to the formation of the contract*, custom, usage, and the interpretation placed on the disputed provision by the parties conduct." Conway, 901 A.2d at 347 (emphasis added). The 1995 Termination Agreement incorporated the pension calculation from the 1991 Termination Agreement. (Def.'s Exs. L at 2 (1995 Termination Agreement) and K at 5 (1991 Termination Agreement).) Simply stated, it is clear that the consistent calculation scheme represented the maximum amount that was to be made available to Nichols from *all* pension plans of Alfa Lava and its affiliates, including those benefits due him under the Canadian Pension Plan.

Nichols has not offered any evidence, other than a self-serving affidavit which contradicts in significant part his earlier deposition testimony, to challenge the premise that the basis for his overall pension benefit had not changed since the original 1988 Employment Agreement. (Def.'s Mem., Ex. J.) Moreover, it is also clear that the 1999 Lump-Sum Agreement was entered into at the request of Nichols because he wanted as much of his overall pension benefit paid in one lump-sum instead of waiting to receive it on a monthly basis over time. (Nichols Dep. 138:21-139:7.) There is simply no credible evidence that presents a *genuine* issue of disputed material fact sufficient to overcome summary judgment confirming that the Canadian Pension had already

been waived, or was otherwise taken into account in arriving at the lump-sum calculation. Nichols simply asserts, in his self-serving statement, that he "did not intend to waive my Canadian qualified pension." (Def.'s Ex. J ¶ 25.)[6] However, where the waiver of the Canadian Pension Plan was a central feature of the prior agreements, and in the absence of any persuasive evidence indicating that Nichols intended to rescind the waiver and exclude the Canadian Pension Plan from the lump-sum calculations, the Court concludes that those provisions that were addressed in prior agreements waiving the Canadian Pension were intended by the parties to be part of the 1999 Lump-Sum Agreement.[7] Indeed, Nichols testified in deposition that:

> Q:    And that $16,000 per month payment starting on February 1, 1995
>       was in lieu of any and all other pension benefits, correct?
>
> A:    Correct.
>
>       . . .
>
> Q:    Okay.  Did you think on January of 1992 that you could get a
>       $16,000 a month pension payment and then get another pension
>       payment from Canada?
>
> A:    I'm trying to recall at that time, but I would say no.

---

[6]Alfa Laval objects to the Court's consideration of Nichols' statement and moves to strike it. (Pl.'s Mot. Strike Statement of David A. Nichols (Pl.'s Mot. Strike) (docket entry no. 44.)  The Court simply discounts it as unpersuasive, given the other more compelling evidence of record, including Nichols' sworn deposition testimony.

[7]Nichols' additional arguments to the effect that the proper value of his Canadian Pension was not accounted for in the various Agreements or the 1999 Lump-Sum Agreement (including the proper beginning date for eligibility), or that it is "illogical" to conclude that he would have waived his rights to a pension benefit for which he was not yet eligible, are also unavailing because the Court holds that all pension benefits, present and future were fully contemplated by the parties regardless of their value (except for any ERISA-protected plan), or considered waived (as with the Canadian Pension), at least in the absence – as here – of any assertion, let alone evidence, that the negotiations involved were other than "arms-length." (Def.'s Mem. at 8-9, 19.)

(Nichols Dep. 112:17-20; 113:14-19.)  By Nichols' own admission, the nearly $16,000 per month he was receiving in pension benefits represented all of the pension benefits to which he thought he was entitled from Alfa Laval, including those due under the Canadian Pension Plan.  Both Alfa Laval and Nichols necessarily understood that he could not "double dip" by receiving both the Canadian Pension in addition to the $16,000 per month total payment.

Such a conclusion is further supported by the fact that if the Court were to accept Nichols' argument, then his overall pension benefit would have exceeded the 42% "cap" that was consistently agreed to in the prior agreements.  If there had never been a lump-sum payment, it is clear from the consistent terms of the agreements that Nichols would have continued receiving monthly payments of $1,500[8] from the U.S. pension plan (that he was entitled to for being re-employed in 1995) and approximately $14,500 as a supplemental pension *i.e.*, non-qualified payment, that would have added up to the overall approximate pension benefit of $16,000 until 2005, when he reached sixty-five.  Then, at age sixty-five, if Nichols had made a claim for his Canadian pension and started to receive a monthly payment, his monthly supplemental pension payment would have been reduced from that point forward by the same amount such that his overall pension benefit would remain "capped" at, approximately, $16,000 monthly to account for the "dollar for dollar" provision contained in the Waiver Agreements.  Therefore, where the lump-sum payment was calculated on such a basis, it necessarily accounted for the Canadian Pension. (See Nichols Dep. 113:14-19.)

Although the 1999 Lump-Sum Agreement only specifically referenced the U. S. pension, there is nothing to support Nichols' claim that the parties agreed that his pension benefit would

---

[8]All figures are "rounded off" for purposes of discussion.

exceed the 42% cap.  The obvious purpose of the lump sum payment was for Nichols to receive a

one-time pay out of all pension benefits, *but for* any benefit he *may be* entitled to under an

ERISA-protected plan.   The conclusion necessarily follows that the provision in the Waiver

Agreements,[9] whereby Alfa Laval would either reduce future monthly payments "dollar for

dollar" by the amount of any other pension (including the Canadian pension benefit) it was

compelled to pay, or, if already paid, it would necessarily be entitled to reimbursement of the

subject amount, is a provision that was intended by the 1999 Lump Sum Agreement to "survive."

In this regard, it does not matter in the final analysis whether Alfa Lava's claim is viewed as an

action for breach of contract for which damages are to be awarded, or a suit seeking

reimbursement for unjust enrichment, because the resulting amount owed is the same if Alfa

Laval prevails.[10]

---

[9]Whereby "in the event the Trustees of the [U.S. Pension Plan or Canadian Pension Plan] or Plan[s'] Administrator[s] *shall be compelled by operation of law* to distribute to [] Nichols and/or [wife], their estates or any entity or person with rights by or through them or either one, the amount to be paid as a result of or by reason of the Agreement shall be reduced, dollar for dollar, by the said distribution(s)."  (Pl.'s Exs. F, G) (emphasis added).  Furthermore, the Court is not persuaded by the argument that the Waiver Agreements were *void ab initio* where the parties specifically contemplated such a possibility by providing for the reduction/reimbursement provision that was to the effect: "if we are wrong, then you owe us the amount we are compelled to pay."

[10]Under New Jersey law, the elements for proving breach of contract are: (1) that a valid contract existed between the parties; (2) that the defendant breached the contract; (3) that the plaintiff performed its obligations under the contract; and (4) that the plaintiff was damaged as a result.  Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 275 F. Supp. 2d 543, 566 (D.N.J. 2003) (citation omitted); URG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994).  As to an action for unjust enrichment, only two elements need to be sustained: (1) that the defendant received a benefit from the plaintiff; and (2) that the retention of the benefit by the defendant is inequitable.  Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 677 A.2d 747, 753 (N.J. 1996).  Under either theory, Alfa Laval has sustained its burden of proof where the parties entered into the 1999 Lump-Sum Agreement that included the "dollar for dollar" reduction/reimbursement provision of earlier agreements if Alfa Laval was compelled to pay the Canadian Pension benefit.  Alfa Laval paid the entire lump sum amount to Nichols that included

To conclude that the 1999 Lump-Sum Agreement did not account for the Canadian Pension would mean that the parties agreed that Alfa Laval suddenly changed its position as maintained throughout the protracted cause of events and bargained for an increase in Nichols' overall pension benefit.  There is no credible evidence or asserted facts supporting such a conclusion.  Accordingly, by receiving payments from his Canadian Pension, which, in effect, Nichols previously received value for in the lump-sum pay out, and failing to reimburse Alfa Laval, Nichols is breaching the basic agreement between the parties that he is to reimburse Alfa Laval dollar-for-dollar the amount of his Canadian pension, unless, as argued by Nichols in the alternative, the claim for breach of contact is preempted by ERISA.  (Def.'s Mem. at 24).

**B.  ERISA Does Not Preempt Alfa Laval's Breach of Contract Claim**

Nichols asserts that the final pension plan ("supplemental pension plan" or "benefit") cannot be considered a "top hat" deferred compensation plan which would exempt it from the protection of ERISA.  However, the argument fails if it is determined that the total monthly pension benefit constituted a "top hat" plan and was thereby exempt from the strictures of ERISA.

The term "top hat" does not appear anywhere in the ERISA statute; rather, the colloquial term is used to refer to certain unfunded plans that fall outside the "coverage" of the statute. Guiragoss v. Khoury, 444 F. Supp. 2d 649, 658 (E.D. Va. 2006); see also 29 U.S.C. § 1051(2) (ERISA does not apply to "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees").  Top hat plans are exempt from ERISA's vesting and participation

---

the Canadian Pension benefit; Nichols has not paid back the amount of the Canadian Pension benefit that Alfa Laval has now been compelled to pay; and Alfa Laval has been damaged in that amount.

requirements, 29 U.S.C. §§ 1051-61, funding requirements, 29 U.S.C. §§ 1081-86, and fiduciary responsibilities, 29 U.S.C. §§ 1101-1114.  Guiragoss, 444 F. Supp. 2d at 658 n.10.  ERISA does not, however, exempt top hat plans from compliance with reporting, disclosure, administration and enforcement provisions.  Id. (citing 29 U.S.C. §§ 1021-31, 1131-45).

The purpose of the "top hat" exception to ERISA coverage is that "certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan . . . and would, therefore, not need the substantive rights and protections of" ERISA.  Bakri v. Venture MFG. Co., 473 F.3d 677, 678 (6th Cir. 2007) (quoting DOL, Office of Pension & Welfare Benefits Programs, Opinion 90-14A, 1990 WL 123933 at *1 (May 8, 1990)).  To be designated a top hat plan, ERISA requires the Court to determine (1) whether the plan is "unfunded"; (2) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees"; and (3) "whether the employees participating in the alleged top hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply."  Guiragoss, 444 F. Supp. 2d at 658-59, 662 (citation omitted).  When undertaking this analysis, the Court must be mindful that ERISA is a remedial statute and, therefore, "exemptions from ERISA coverage must be confined to their narrow purpose."  Id. at 659.

There is no issue of whether the second and third elements are met in this case.  The non-qualified supplemental pension plan was created for and involved only Nichols who, at the time, was the President and CEO of the corporation.  Given the position, Nichols was exactly the type

of individual (a high-ranking executive) who is assumed to possess a favorable bargaining position to negotiate the terms of a retirement pension agreement.  Id. at 661-62.  In regard to the remaining element – whether the pension benefit was funded or not – Nichols asserts that it was funded because the pension was guaranteed by a letter of credit, and, as such, constituted a separate, primary source of funding for Alfa Laval's obligation.  (Def.'s Mem. at 21-22).

ERISA does not define "funded" to assist in the determination of whether a plan qualifies as a "top hat" plan.  Nonetheless, courts have routinely held that whether a plan is unfunded requires a straightforward analysis and depends on whether the plan has a funding source apart from the general assets of the company.  See Guiragoss, 444 F. Supp. 2d at 659 (citing Reliable Home Health Care, Inc. v. Union Central Ins. Co., 295 F.3d 505, 514 (5th Cir. 2002)); see also Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208, 1214 (8th Cir. 1981) ("funding implies the existence of a *res* separate from the ordinary assets of the corporation.").  "If there is no separately maintained account distinct from the company's general assets, then the plan is unfunded."  Guiragoss, 444 F. Supp. 2d at 660.  "Thus, participants of unfunded plans have no preferred claim or ownership interest in plan assets, because there are no designated plan assets. The rights of an unfunded plan participant are equivalent to those of an unsecured creditor of the employer's general assets."  Sally Lerner Gallati, Note, The ERISA Hokey-Pokey: You Put Your Top Hat In, You Put Your Top Hat Out, 5 Nev. L.J. 587, 590 n.22 (2004) (citing Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 287 (2d Cir. 2000)).  Other than the provision involving the letter of credit, there is nothing in any of the various agreements that deals with the funding of the total pension scheme.  While the original 1988 Employment Agreement provided that the overall pension benefit would be paid from "any funded pension schemes . . . of the Alfa

Laval Group for which [Nichols is] eligible," it also specified that "[t]o the extent that is necessary, out of the general assets of Alfa Laval Inc" and there is no evidence that the supplemental pension benefit was paid from a funded source as opposed to the general assets of Alfa Laval.  (Pl.'s Mem. Ex. D at 3.)  There is nothing in any of the Agreements to suggest that Alfa Laval had any intention of funding the supplemental pension benefit in any other manner. Likewise, in the 1995 Termination Agreement, the parties agreed that the pension benefit obligation was to be guaranteed as "general obligations of [Tetra Laval U.S. Holdings, Inc. (the Guarantor)][11] and without the necessity of prior funding or segregation or dedication of any accounts, funds or other assets."  (Def.'s Ex. L at 6.)  Alfa Laval simply agreed to provide the letter of credit in the 1995 Termination Agreement and the 1997 Amendment to guarantee its pension obligation if it failed to perform.  Accordingly, Nichols was issued an irrevocable standby Letter of Credit by Svenska Handelsbanken, a Scandinavian bank (the "Bank").  (Def.'s Mem. Ex. S).

A letter of credit is "an instrument under which the issuer (usually a bank), at the customer's request, agrees to honor a draft or other demand for payment made by a third party (the beneficiary), as long as the draft or demand complies with specified conditions, and regardless of whether any underlying agreement between the customer and the beneficiary is satisfied."  Black's Law Dictionary 923 (8th ed. 2004) (italics omitted).  More specifically, a standby letter of credit is one used to guarantee, among other things, a monetary obligation, whereby the issuing bank agrees to pay the beneficiary if the bank customer defaults on its obligation.  Id.  Here, the issuer was the Bank, Alfa Laval was the customer, and the beneficiary

---

[11]See pg. 6, *supra*.

was Nichols; the standby letter of credit issued by the Bank in this case insured that Nichols

would receive his pension benefits from Alfa Laval *if* Alfa Laval became unable to make such

payments.

Nichols' standby letter of credit differs markedly from a commercial letter of credit, for in

the former, the issuer (the Bank) agrees to pay the beneficiary (Nichols) *only if* the customer (Alfa

Laval) fails to make payments according to the contract between the customer and beneficiary,

while with a commercial letter of credit, the beneficiary obtains payment from the issuer without

seeking payment from the customer.  See FDIC v. Philadelphia Gear Corp., 476 U.S. 426, 428

(1986).  Thus, the Bank as the issuer of the standby letter of credit is a guarantor of the contract

between the customer and the beneficiary and only has to perform (pay) if the customer (Alfa

Laval) fails to do so.

Here, Alfa Laval contracted with Nichols to provide him with a monthly pension, and, in

turn, Alfa Laval contracted with the Bank to issue a standby letter of credit in favor of Nichols

whereby the Bank would honor the letter of credit if Alfa Laval failed to fulfill its contractual

obligations to Nichols.  However, where Alfa Laval did not default, Nichols' pension payments

were still paid out of the general assets of Alfa Laval and there is no evidence or allegation that

Alfa Laval maintained a segregated fund or that it established a trust from which the pension

benefits were to be paid.  A standby letter of credit, by its very nature, is not an asset of the

employer, but rather a contingent obligation of the bank involved.

Nichols' assertion that "[t]his Letter of Credit gave Mr. Nichols a superior right to any

creditor of Alfa Laval" is premised upon a misunderstanding of the elements of a standby letter of

credit.  Nichols could have presented the letter of credit to the Bank only if Alfa Laval had failed

in its obligations set forth in the letter of credit, regardless of whether Alfa Laval was acquired by another company, became insolvent, or simply refused to make pension payments as required by the Agreement(s).  Thus, Nichols would not be a secured creditor of Alfa Laval in the event of Alfa Laval's default, but rather an unsecured creditor.  However, the Bank, due to the letter of credit contract between it and Alfa Laval, would become a secured creditor of the Plaintiff.

Because the standby letter of credit was only a contingent obligation between the Bank and Alfa Laval, and because there is nothing in the various Agreements indicating that the total pension benefit was funded by other than Alfa Laval's general assets, the guaranteed payment was unfunded within the meaning of ERISA and met the requirements for being considered a "top hat" plan so as to be exempt from ERISA application and preemption.

## CONCLUSION

The parties bargained for an overall pension benefit for Nichols in successive agreements that would entitle him to a maximum/minimum yearly pension based on a percentage of his final pensionable salary which would be payable on a monthly basis.  The parties agreed that the total pension benefit would be comprised of any pension that Alfa Laval or its affiliates would be obligated to pay Nichols, plus a supplemental payment to satisfy any additional benefit he would be entitled to so that he would receive no more and no less than the maximum yearly pension agreed upon.  Nichols asserts that Alfa Laval abandoned the basic premise at some point such that his overall pension benefit would be increased if he were to receive the Canadian Pension.[12] There is nothing in the record to suggest that Alfa Laval agreed to unilaterally abandon the basic

_____

[12]As previously noted, the Court discounts the self-serving, post-deposition contradictory statement of Nichols offered in support of his position for the reasons articulated by the defense in its objection to the statement.  (Pl.'s Mot. Strike) (citing Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984)).

pension scheme.  Nor is there any evidence, extrinsic or otherwise, to suggest that the mutual intention of the parties was to abandon the Waiver Agreements.  Hence, the provision that would require reduction of the monthly payment or, as has now occurred, reimbursement of the amount Alfa Laval was compelled by operation of Canadian law to pay, becomes due and owing.

Therefore, where Nichols was paid a lump-sum on the basis that it included all pension benefits, he must pay as damages, or reimburse Alfa Laval as the result of unjust enrichment, the value of the Canadian pension that Alfa Laval was directed by Canadian authorities to pay.

An appropriate Order shall issue.


_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge


Dated: 3/29/07